**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BENARD MCKINLEY,

     Plaintiff,

     v.

DAVID GOMEZ and LUSECITA GALINDO,

     Defendants.

No. 22 CV 5459

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Benard McKinley was an inmate at Stateville Correctional Center in December 2021 when the COVID-19 Omicron outbreak hit the prison. McKinley alleges that his cellmate tested positive for COVID, and four days later, McKinley tested positive as well. Defendant David Gomez was the warden, responsible for directing operations and formulating policy. Defendant Lusecita Galindo was the health care unit administrator, responsible for overseeing the healthcare unit. Plaintiff brings suit against defendants in their individual capacities for failing to protect him from a known and unreasonable risk of serious harm while in the custody of the Department of Corrections, in violation of the Eighth Amendment under 42 U.S.C. § 1983. Defendants move for summary judgment. For the reasons discussed below, defendants' motion is granted.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether summary judgment should be granted, I view all the facts and draw reasonable inferences in favor of the non-moving party. *See Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023). The court gives the non-moving party "the benefit of reasonable inferences from evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

## II.     Local Rules 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc..* 919 F.3d 405, 415 (7th Cir. 2019). The moving party must file a supporting memorandum of law and statement of facts demonstrating that it is entitled to judgment as a matter of law. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a). The non-moving party must file a response to that statement and may provide a separate statement of additional facts. N.D. Ill. Local R. 56.1(b)(2)–(3).

Statements of facts and additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(a), (b)(3). The non-moving party must cite specific, admissible evidence to dispute an asserted fact and concisely explain how the cited material controverts the asserted fact. N.D. Ill. Local R. 56.1(b)(3).

Defendants move to strike dozens of plaintiff's statements of additional facts for containing compound facts, employing a "shotgun" approach to citations, and asserting legal arguments. [134] at 1–3.[1]

Several of plaintiff's statements of additional fact are not concise and combine several facts into a single statement. *See, e.g.*, [135] ¶¶ 1–4, 11–12, 21. Plaintiff also strings together citations at the end of these paragraphs without indicating which citation supports which fact. Nevertheless, the record is not so cumbersome that the assertions and supporting evidence cannot be compared. Although I would be within my discretion to strike plaintiff's assertions (leaving defendants' motion undisputed in significant part), I consider those facts that are properly supported by the record.

A "Rule 56.1 statement is not the province of legal arguments." *Hartford Fire Ins. Co. v. Taylor*, 903 F.Supp.2d 623, 634 (N.D. Ill. 2012). I disregard all legal arguments in plaintiff's additional statement of facts. *See* [135] ¶ 35. Defendants also object to assertions citing expert opinions. [134] at 3. They argue that these opinions are not facts and therefore inadmissible for summary-judgment purposes. [134] at 3. But Federal Rule of Evidence 702 states that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." Defendants have not challenged the qualifications of plaintiff's proposed

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from the parties' responses to their adversary's Local Rule 56.1 statement of facts, [127] and [135], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

experts—nor rebutted their testimony—and the cited opinions are in the record. [129-11]; [129-12]; [129-13]. Defendants' objection to expert testimony is overruled.

## III. Facts

Plaintiff Benard McKinley was housed at Stateville Correctional Center from May 2004 until April 2024. [127] ¶ 1. Before January 2022, McKinley was diagnosed with asthma, which has been identified as a significant risk factor for severe COVID-19. [135] ¶ 28.

Defendant David Gomez was the warden of Stateville from February 2020 to February 2022. [127] ¶ 5. Gomez's responsibilities included administering and directing overall operations; formulating policy, procedures, rules, regulations, and institutional directives for employees and inmates; and assigning work activities and areas of responsibility for all department heads. [127] ¶ 6. Gomez was not responsible for providing medical care to individuals in custody or moving inmates from one cell to another. [127] ¶ 7.

Defendant Lusecita Galindo was the health care unit administrator at Stateville from September 2020 to October 2022. [127] ¶ 8. Galindo's responsibilities included overseeing the healthcare unit, preventing and containing the spread of COVID, performing safety and sanitation inspections, and complying with the infection-control protocol established by IDOC. [127] ¶ 9; [135] ¶ 11.

The parties dispute whether defendants were responsible for identifying and coordinating movement of COVID-positive inmates for isolation, [127] ¶ 10, and

4

determining what resources could be operationalized to prevent housing COVID-positive individuals with COVID-negative individuals, [127] ¶ 7.

In January 2022, defendants were in charge of ensuring that COVID safety protocols, including directives from IDOC and public health guidance from the CDC, were followed in Stateville. [135] ¶ 9. At that time, IDOC policy recommended that individuals who tested positive for COVID be separated and isolated from individuals who tested negative. [129-8] at 4 ("Positive cases should be isolated…"); [129-10] at 2 ("It is recommended that individuals in custody who test positive for COVID-19 be placed in isolation…"); [135] ¶¶ 12–14.[2] IDOC guidance also warned that the Omicron variant spread rapidly—even from asymptomatic and vaccinated individuals. [135] ¶ 15. Gomez was aware of these directives. [135] ¶ 15. Though it is disputed whether Galindo was aware of this specific guidance, it is undisputed that her job responsibilities included ensuring that healthcare staff complied with infection-control protocol established by IDOC. [135] ¶ 11.

Gomez was part of the Stateville Command Center. [127] ¶ 19. The Command Center received direction from the statewide command post in Springfield and was tasked with disseminating the information throughout the Stateville facility. [127] ¶ 20. The parties dispute whether Galindo was a member of the Command Center

---

[2] Throughout his briefing, plaintiff states that IDOC had a clear isolation requirement. *See, e.g.*, [126] at 8, 13, 14. Yet the CDC acknowledged that it may be difficult to maintain physical distancing in prison settings, [129-9] at 2, and the IDOC's guidance made clear that it recommended, as opposed to required, placing COVID-positive inmates in isolation for ten days. [129-10] at 2.

and whether the Command Center was responsible for creating (as opposed to just implementing) isolation policies during COVID. [127] ¶ 30.

On January 4, 2022, McKinley and his cellmate were tested for COVID. [135] ¶ 2. Neither plaintiff nor his cellmate were provided with their test results. [135] ¶ 2. Four days later, plaintiff was tested for COVID but his cellmate was not tested. [135] ¶ 4. Dr. Henze, who personally delivered test results to incarcerated people at Stateville, testified that incarcerated people were expected to deduce their positive status when they were skipped for the routine four-day test. [135] ¶ 23. Thus, though plaintiff lacks medical evidence to verify the claim, circumstantial evidence supports the inference that his cellmate had tested positive on January 4. [135] ¶ 2.

On his Warden's Bulletin dated January 4, 2022, Gomez warned of the rise in positive COVID cases and advised that additional personal protective equipment and cleaning supplies would be issued. [127] ¶ 62. The bulletin also recommended that everyone wear a mask, wash hands frequently, and socially distance where possible. [127] ¶ 62. Two areas of Stateville not intended to house inmates were retrofitted to be made available for isolating individuals, though it is unclear when this occurred, and may not have happened until toward the end of January 2022. [127] ¶ 25.

On January 8, 2022, plaintiff filed an emergency grievance stating that Stateville prison officials created an unsafe prison environment by forcing incarcerated people to live, shower, and congregate with individuals who had tested positive for COVID. [135] ¶ 3. The warden designated someone to handle all grievances. [127] ¶ 22. In Gomez's two years as warden, he "reviewed maybe one or

two emergency grievances." [127] ¶ 22. On January 18, 2022, plaintiff submitted a similar grievance through the traditional pathway. [135] ¶ 3. The grievances do not establish whether Gomez reviewed them. [127] ¶ 24.

McKinley and his cellmate were not separated after the cellmate tested positive. They were left in the dark and placed on a "quarantine status" that did not involve isolating them from other COVID-negative inmates. [135] ¶ 5. Joseph Ssenfuma was the Agency Infection Disease Coordinator at IDOC during the relevant period. [127] ¶ 24. He testified that he would have advised Stateville against what plaintiff calls this "no isolation" policy because it violated CDC guidance as interpreted by IDOC. [135] ¶ 19.

Plaintiff was not tested on January 11 and learned on January 18 that this was because his January 8 sample had tested positive. [135] ¶ 7. After contracting COVID, plaintiff reported persistent headaches, difficulty concentrating, lack of full taste and smell, and shortness of breath. [135] ¶ 31. Dr. Nancy Glick opined that "in a congregate environment like Stateville Correctional Center, the consequences of delayed notification are even more concerning." [135] ¶ 34. Dr. Danielle Ompad concluded that McKinley "likely" contracted COVID because he was housed in a small cell with a person who was COVID-positive. [135] ¶ 36. Defendants challenge the foundation for both of these assertions. [135] ¶¶ 34–35.

McKinley brings suit under 42 U.S.C. § 1983 against Gomez and Galindo alleging that they knew and disregarded the substantial risk of serious harm posed by COVID-19 in violation of the Eighth Amendment. [62] ¶ 42.

## IV. Analysis

### A. Deliberate Indifference and Personal Involvement

McKinley's claim arises under the Eighth Amendment. As applicable here, the amendment prohibits prison conditions that (1) pose a substantial risk of serious harm and (2) are the result of a sufficiently culpable state of mind, namely the defendants' deliberate indifference to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Officials are deliberately indifferent if they "acted or failed to act despite [their] knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. But "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. […] [P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 844–45.

Defendants do not challenge the first element of this framework. Close contact to an individual with a confirmed COVID-19 infection was a "high-risk exposure" in a corrections environment. *See* [129-8] at 4 (IDOC definition of high-risk exposure). Defendants instead challenge the second element—whether they were deliberately indifferent to a substantial risk of serious harm or McKinley's serious medical need. [115] at 3–10.

Defendants also contend that they were not "personally involved" in the allegations in McKinley's complaint. [134] at 7. Under § 1983, state officials may be sued in their individual capacity only for actions "taken under color of state law."

8

*Gonzalez v. McHenry Cnty.*, 40 F.4th 824, 828 (7th Cir. 2022) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). To establish personal liability, McKinley must show that each defendant "caused the constitutional deprivation at issue" or "acquiesced in some demonstrable way in the alleged constitutional violation." *Id.* (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)). Gomez and Galindo cannot be held liable under § 1983 unless they had some "personal involvement in the alleged constitutional deprivation." *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). For a supervisor to be liable for the conduct of others, he or she "must both (1) 'know about the conduct' and (2) facilitate, approve, condone, or turn a blind eye toward it." *Gonzalez*, 40 F.4th at 828 (quoting *Kemp v. Fulton Cnty.*, 27 F.4th 491, 498 (7th Cir. 2022)). "[A] supervisor is liable if he acted purposefully, knowingly, or recklessly, but *not* negligently." *Id.* (emphasis in original).

Both deliberate indifference and defendants' personal involvement depend on each defendant's subjective, purposeful conduct toward the decision not to isolate McKinley from his cellmate after his cellmate tested positive for COVID.

Defendants argue that they were not responsible for creating the COVID policies that McKinley is challenging. [115] at 8. Gomez was a member of the Stateville Command Center. [135] ¶ 17. Viewing the facts in the light most favorable to McKinley, Galindo was also part of the Command Center. [134] at 11–12. But defendants argue that the statewide command post in Springfield set the policies and procedures related to COVID; the Stateville Command Center was merely responsible for ensuring that the facility was comporting with those requirements.

[115] at 4; [114-4] at 14:2–24. This is consistent with the testimony of Ssenfuma, who similarly stated that the warden was responsible for making sure that the statewide policies were being implemented and followed. [114-8] at 63:15–64:4.

The apportionment of responsibility between statewide and prison-level command posts is disputed. Dr. Henze admitted that "the Illinois Department of Public Health, Illinois Office of Health Services, in conjunction with Stateville Warden and the administrative staff at Stateville Correctional Center working as a 'command center' discussed, created, and implemented a policy in which inmates at Stateville who tested positive for COVID-19 were allowed to remain in their cells with cellmates who had tested negative for COVID-19." [129-6] ¶ 10.

Whether defendants helped create—or merely implemented—"policy related to isolating individuals in custody who tested positive" is immaterial, because it is undisputed that the statewide command post recommended isolating COVID-positive individuals from COVID-negative individuals and Gomez failed to follow that recommendation. [115] at 4; [135] ¶ 12. But violating prison policy or CDC guidelines is not itself a constitutional violation. *Shipp v. Lobenstein*, 2025 WL 1139257, at *3 (7th Cir. 2025). As explained in *Hope v. Warden York County Prison*, "deliberate indifference is a subjective standard of liability consistent with recklessness as that term is defined in criminal law." 972 F.3d 310, 330 (3d Cir. 2020) (internal quotation marks omitted); *see also Whittenberg v. La Voie*, 2026 WL 94974, at *2 (7th Cir. Jan. 13, 2026) (noting that deliberate indifference "reflects a mental state … properly equated with reckless disregard" (citation omitted)).

10

Here, McKinley has not provided evidence that Gomez's failure to implement an effective isolation policy consistent with IDOC recommendations elevates his conduct from negligence to criminal recklessness. Gomez took steps to mitigate the spread of the virus. [127] ¶ 62. The Constitution does not demand that defendants pursue McKinley's preferred course of action. *See Shipp*, 2025 WL 1139257, at *3. And Gomez *did* try to isolate COVID-positive patients. [114-5] at 24:13–25:11 ("Stateville having a large population at that time and having units that were closed, there were limited areas to move people to. … So we did the best to isolate individuals the best we could."). Given that the "Omicron variant spread[] more easily than the original [variant]," and that "1,567 individuals in custody" were COVID-positive on January 10, 2022, it is not unreasonable that the Stateville isolation practice would be less than perfect. [129-10] at 2.

Gomez did not deliberately disregard the risk of infection in the prison. Gomez's bulletin explicitly recommended that everyone inside the facility wear a mask, consistent with IDOC guidance: "Because it is difficult to safely social distance inside correctional facilities, it is critical that everyone wears a mask in any shared spaces." [129-10] at 2. Even if Gomez "had authority to protect" McKinley, [126] at 15, the mere failure "to choose the best course of action does not amount to a constitutional violation." *Money v. Pritzker*, 453 F.Supp.3d 1103, 1131 (N.D. Ill. 2020) (quoting *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)); *see also Shipp*, 2025 WL 1139257, at *3. Indeed, nothing in the Eighth Amendment requires a warden "to eliminate all risk" of inmates contracting COVID. *Hope*, 972 F.3d at 330.

11

McKinley next argues that defendants were deliberately indifferent in their failure to protect individuals with chronic respiratory conditions (such as himself) from contracting COVID. [126] at 18–26. Defendants do not dispute that plaintiff faced a heightened risk of severe complications from COVID. [134] at 8.

McKinley contends that defendants' specific responsibilities establish that they "were in positions that required them to know, and act on, information concerning medically vulnerable individuals." [126] at 19. This is a *respondeat superior* argument. *See Ollison v. Gossett*, 136 F.4th 729, 735–36 (7th Cir. 2025). McKinley does not produce any evidence contradicting defendants' lack of subjective knowledge or purposeful conduct. *See, e.g.*, [127] ¶¶ 43–46 (showing the plaintiff's interactions with defendants did not include putting them on notice of his heightened risk of complications). And again, even if defendants had the authority to craft a better testing policy, with timely notice of test results and perfect isolation of COVID-positive individuals, that does not establish that their conduct was constitutionally deficient as applied to plaintiff. *See Shipp*, 2025 WL 1139257, at *3. McKinley must point to something more to allow a jury to infer that defendants deliberately ignored a substantial risk to him when they chose one approach to infection mitigation over the IDOC-level recommendation.

McKinley attempts to establish that Gomez was on notice of the substantial risk to serious harm that he faced through this failure to isolate by pointing to the emergency grievance he filed. [126] at 16–17. But the stamps on plaintiff's grievances show that they were not received until January 14 (for his January 8 grievance) and

12

January 26 (for his January 18 grievance). [129-1]; [114-7]. Given that McKinley tested positive for COVID on January 8, any notice they established would have occurred too late.[3]

There is no genuine dispute of material fact over whether defendants Gomez and Galindo were deliberately indifferent to a substantial risk of serious harm by failing to isolate McKinley from his cellmate. Summary judgment is thus appropriate.

### B.    Causation

For the sake of completeness, I address defendants' two remaining arguments: causation and qualified immunity. In addition to challenging deliberate indifference, defendants also argue that, regardless of their involvement, plaintiff cannot show that he contracted COVID as a result of their failure to isolate his cellmate. [115] at 10–12. Courts assess causation in § 1983 cases using "general principles of causation from tort law." *Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023) (citing *Whitlock v, Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012)). McKinley must thus show that the alleged tortious act is both a but-for cause and a proximate cause of his injury. *Id.*

Proximate cause exists when the plaintiff's injury "is of a type that a reasonable person would see as a likely result of his or her conduct." *Id.* (citation

---

[3] And this is assuming notice can even be imputed to Gomez in a case such as this, where he had delegated the authority to review grievances. [127] ¶ 22. I need not determine whether the grievances were sufficient grounds to infer notice because they were not received in time to place Gomez on notice of plaintiff's health issues before he had contracted COVID.

omitted). In other words, proximate cause limits liability to injuries that are reasonably related to a defendant's wrongful act.

Defendants argue that plaintiff cannot prove a nexus linking McKinley contracting COVID to his cellmate. [115] at 11. Defendants contend that plaintiff is speculating as to how he contracted COVID and that such speculation cannot survive summary judgment. [134] at 13. But "the causal link between a defendant's deliberate indifference and a plaintiff's injury is typically a question reserved for the jury." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 615 (7th Cir. 2022). Medical evidence of direct causation is not required to defeat summary judgment. *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016).

Here, McKinley has offered unrebutted expert opinion that plaintiff "likely contracted COVID-19 because he was housed in a small cell with a person who was COVID-19 positive." [129-11] ¶ 33. Even without Dr. Ompad's report, a "common-sense link" between prison conditions and a plaintiff's asserted ailments can be sufficient for a jury to infer causation. *Gray*, 826 F.3d at 1007. Common sense—in addition to public health guidance and IDOC policy—supports McKinley's contention that he contracted COVID because of defendants' failure to isolate him from his cellmate. A reasonable juror can find a causal link between defendants' actions and McKinley's injury.

### C.    Qualified Immunity

Gomez asserts in the heading of his final argument that he is entitled to qualified immunity. [115] at 12. But the body of this section is further argument

14

challenging his alleged deliberate indifference. The section is devoid of caselaw or arguments explaining why Gomez is entitled to qualified immunity. The section is further silent on whether Galindo is entitled to qualified immunity. Defendants have waived the argument at summary judgment. *See Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("Seventh Circuit precedent is clear that perfunctory and undeveloped arguments … are waived." (internal quotation marks omitted)). If, however, defendants had properly raised the issue of qualified immunity, this would have imposed another significant barrier to a trial on McKinley's claim. "Qualified immunity shields a government official from suit or damages under § 1983 when [they] make[] a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [they] confronted." *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (internal quotation marks omitted). To overcome qualified immunity, McKinley would need to show (1) that defendants violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Id.* (citations omitted). And although defendants did not adequately brief the issue, it remains an immunity from trial that would need to be resolved as early as possible. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013 (7th Cir. 2006).

In contrast to claims concerning unsanitary living conditions, such as those at issue in *Gray*, whether failure to implement a failsafe COVID isolation policy amounted to cruel and unusual punishment was not settled by the courts of appeal or the Supreme Court in January 2022. McKinley argues that it was clearly

15

established that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease." [126] at 29–30 (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). But courts should not "define clearly established law at too high a level of generality." *Sabo*, 128 F.4th at 844 (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)). McKinley does not identify any precedent that establishes "beyond debate" that a prison administrator's failure to isolate inmates during the COVID pandemic constitutes a violation of the Eighth Amendment. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

## V.      Conclusion

Defendants' motion for summary judgment, [113], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: April 16, 2026

16